UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

GENERAL MOTORS CORP.,      )
                           )
        Plaintiff,         )
                           )
vs.                        )        2:09-CV-00490-LSC
                           )
SERRA CHEVROLET, INC., et al.,   )
                           )
        Defendants.        )

MEMORANDUM OF OPINION

I.    Introduction.

On March 13, 2009, plaintiff General Motors Corporation ("GM") filed

the above-entitled action, which seeks a declaratory judgment relating to

a buy/sell agreement ("Asset Purchase Agreement") involving Sonic-Williams

Cadillac, Inc., d/b/a Tom Williams Cadillac ("Williams"), as seller of an

existing Cadillac dealership, and Serra Chevrolet, Inc. ("Serra"), as proposed

purchaser of the dealership assets.  Specifically, GM seeks a declaration that

(1) GM may exercise a contractual right of first refusal ("Count I"); (2)

Section 5.8 of the Asset Purchase Agreement is null and void ("Count II");

and (3) GM is not obligated to pay Serra approximately $1.2 million in

alleged debt forgiveness and sales tax revenue relief offered by the City of Birmingham ("Count III").

The parties have jointly filed "Stipulations of Fact" (Doc. 15), a set of assumed facts from which this Court is asked to resolve Counts I through III, as a matter of law, to the extent the factual stipulations permit such a determination (Doc. 14 ¶ 1). The parties have requested an expedited ruling and agreed to waive their right to appeal this Court's decision on Counts I and III. (Doc. 14 ¶¶ 5, 7.) The issues raised in Counts I through III of GM's Complaint have been briefed by the parties and are ripe for review pursuant to the parties' Consent Decree of Procedure for Expedited Resolution.[1] (Doc. 14.)

II.   Background.[2]

GM manufactures new motor vehicles and distributes those vehicles in the State of Alabama through its independent dealers under the terms of

---

[1] On Friday, April 10, 2009, at 4:24 p.m., Serra filed a motion for leave to file a reply brief to further argue the issue of GM's right of first refusal. (Doc. 24.) That motion will be denied. Together, the parties agreed on a briefing schedule in order to expedite this Court's decision on the matters addressed in this Opinion. Now, Serra seeks to "have the last word," contrary to the parties' agreement. Regardless, the arguments made in Serra's proposed reply brief do not change the Court's decision.

[2] The facts set forth in this section are taken from the parties' jointly-filed "Stipulations of Fact." (Doc. 15.)

Dealer Sales and Service Agreements.  Defendant Williams is a party to a Dealer Sales and Service Agreement ("Dealer Agreement") with GM, and operates a Cadillac dealership in Irondale, Alabama.  Defendant Serra owns and operates a Chevrolet dealership in Birmingham, Alabama, and is also a party to a Dealer Sales and Service Agreement with GM with respect to that Chevrolet dealership.

Around January 8, 2009, Williams and Serra entered into an Asset Purchase Agreement that, if implemented, would transfer the ownership of the Williams Cadillac dealership assets to Serra, subject to certain conditions set forth in the Asset Purchase Agreement.  The parties have stipulated that the Asset Purchase Agreement was properly executed and is a valid and enforceable contract, subject to this Court's determination whether Section 5.8 is void.  The Asset Purchase Agreement lists the "aggregate purchase price" or "purchase price" in Section 2.2 as $600,000, plus the sum of costs for various assets not at issue in this case.[3]  Section 5.8 of the Asset Purchase Agreement provides:

---

[3]For the purposes of this Opinion, the Court will no longer reference the cost of these additional specified assets that are not disputed in this case.  Rather, the Court will discuss only the $600,000 as the "aggregate purchase price" or "purchase price."

5.8    **Structuring Fee**: Seller and Buyer acknowledge and agree that Serra Chevrolet, Inc. ("**Serra**") has incurred, and will continue to incur, substantial cost and expense in connection with structuring the transactions contemplated by this Agreement and conducting a due diligence investigation.    In consideration thereof, Seller hereby agrees to pay to Serra at the Closing a fee in the amount of Two Hundred Thousand Dollars ($200,000) (the "**Structuring Fee**").  To the extent that Seller does not make separate payment of the Structuring Fee to Serra at the Closing and if Buyer is Serra or a permitted assignee of Serra pursuant to Section 11.1, Buyer or such permitted assignee shall be entitled to deduct the Structuring Fee from the Purchase Price payable by Buyer at the Closing pursuant to Section 2.2 and said action shall be Serra's sole and exclusive remedy.  Seller and Buyer acknowledge that the right to be paid the Structuring Fee is personal and unique to Serra and is non-transferable to any person who might have or claim to have a right of first refusal, based upon this Agreement and/or the transactions contemplated hereby because such person shall not have been required to incur such cost and expense of structuring and due diligence incurred by Serra.  In the event that any person, including, without limitation, the Manufacturer or any other person claiming by, through or under the Manufacturer (the "**Right of First Refusal Holder**"), shall exercise any right of first refusal, preemptive right or other similar right with respect to the Assets, the Seller will upon the closing of the sale of the Assets from Seller to the Right of First Refusal Holder pursuant to the exercise of such right of first refusal, preemptive right or

> other similar right, promptly pay or cause to be paid to Serra the Structuring Fee, and the Right of First Refusal Holder shall not be entitled to any reduction in the Purchase Price.  If the Closing does not occur for any reason whatsoever with the Assets being sold to Buyer, its permitted assignee or the Right of First Refusal Holder, then no Structuring Fee shall be payable under this Section 5.8.

On January 9, 2009, Williams submitted the Asset Purchase Agreement to GM because the proposed transfer required GM approval under the Dealer Agreement.

By letter dated March 2, 2009, GM informed Williams that GM was exercising its right of first refusal pursuant to Section 12.3 of the Dealer Agreement.  Section 12.3  of the Dealer Agreement reads, in part:

> **12.3.1 Creation and Coverage**
> If Dealer submits a proposal for a change of ownership under Article 12.2, General Motors will have a right of first refusal to purchase the dealership assets of stock and such other rights proposed to be transferred regardless of whether the proposed buyer is qualified to be a dealer.   If General Motors chooses to exercise this right, it will do so in its written response to Dealer's proposal.  General Motors will have a reasonable opportunity to inspect the assets, including real estate, and corporate records before making its decision.

**12.3.2 Purchase Price and Other Terms of Sale**
If Dealer has entered into a bona fide written buy/sale agreement, the purchase price and other terms for sale will be those set forth in such agreement and any related documents, unless Dealer and General Motors agree to other terms. . . .

The parties agree that GM exercised its right of first refusal in a timely manner.

GM exercised its right of first refusal to carry out its dealer network restructuring efforts, which are outlined in GM's Viability Plan presented to Congress on December 2, 2008, and GM's updated Viability Plan presented to the U.S. Treasury Department on February 17, 2009. GM seeks to close the Williams Cadillac dealership, and reduce the number of Cadillac dealers in the greater metro Birmingham area from two to one. GM did not exercise the right of first refusal based on Serra's performance.

After being informed on or about March 3, 2009, that GM had exercised its right of first refusal, Serra indicated that it was considering initiating legal action against GM. GM has offered to pay the reasonable expenses incurred by Serra in negotiating and implementing the Asset Purchase Agreement, as required by Alabama Code § 8-20-4(3)(k)(4), and outlined in

the Dealer Agreement, which provides:

> **12.3.6 Expenses**
> If General Motors exercises its right of first refusal, General Motors agrees to pay the proposed owner the reasonable expenses, including attorney fees, that do not exceed the usual, customary, and reasonable fees charged for similar work done for other clients, and that are incurred by the proposed owner in negotiating and implementing the contract for the proposed change in Dealer ownership before General Motors gives notice of its right of first refusal. The proposed owner must provide a reasonable accounting and documentation of such expenses to receive reimbursement.

Serra has not provided an itemization of expenses, but Serra has made claims that GM owes, among other things, approximately $1,185,000 in lost incentives from the City of Birmingham, which includes $685,000 in claimed debt forgiveness from the City of Birmingham and $500,000 in sales tax revenue relief. GM disputes that these amounts are recoverable. GM also contends that Section 5.8 of the Asset Purchase Agreement is void.

III.   Discussion.

A.   Count I: Right of First Refusal.

GM requests a declaration from this Court that its exercise of the right of first refusal is in compliance with the Dealer Agreement and applicable

law.  Defendant Serra contends that GM cannot exercise its right of first refusal because GM would then "operate and control a dealership in direct contravention of Alabama's Motor Vehicle Franchise Act" and such exercise "is an arbitrary action that will harm Serra and Alabama consumers."  (Doc. 18 at 19, 26-27.)

It is undisputed by the parties that Alabama's Motor Vehicle Franchise Act ("the Franchise Act"), Ala. Code § 8-20-1, *et seq.*, permits a manufacturer to exercise a contractual right of first refusal if certain conditions are met.  The Franchise Act provides as follows:

> A manufacturer or distributor may exercise a contractual right of first refusal with respect to the sale or transfer of the interest of the dealer only if each of the following requirements are met:
>
> > 1. The sale or transfer is not to a family member of an owner of the dealership, nor a managerial employee of the dealership owning 15 percent or more of the dealership, nor a corporation, partnership, or other legal entity owned by the existing owners of the dealership.  For purposes of this subparagraph, a "family member" means the spouse of an owner of the dealership, the child, grandchild, brother, sister, or parent of an owner, or a spouse of one of those family members.

2. The manufacturer or distributor notifies the dealer in writing within 60 days after receipt of the completed application forms and related information generally used by a manufacturer or distributor to conduct its review and a copy of all agreements regarding the proposed transfer of its intent to exercise its right of first refusal or its rejection of the proposed transfer. If the manufacturer or distributor fails to notify the dealer of its exercise of the right of first refusal or its rejection of the proposed transferee within the 60-day period, the effect of such failure shall constitute approval of the proposed sale or transfer. If the manufacturer or distributor exercises a right of first refusal under this section, the transfer shall be deemed to be rejected.

3. The exercise of the right of first refusal provides to the dealer the same compensation as, or greater compensation than, the dealer had negotiated to receive from the proposed buyer or transferee.

4. The manufacturer or distributor agrees to pay the reasonable expenses, including reasonable attorneys' and accountants' fees that do not exceed the usual, customary, and reasonable fees charged for similar work done for other clients incurred by the proposed buyer or transferee before the manufacturer's or distributor's exercise of its right of first refusal in negotiating and implementing the contract for the sale or transfer.  The proposed

> buyer or transferee shall provide to the manufacturer or distributor a written itemization of the expenses incurred within 30 days of the receipt by the proposed buyer or transferee of a written request from the manufacturer or distributor for an accounting of the expenses. The manufacturer or distributor shall make payment of these expenses within 30 days of exercising the right of first refusal.

Ala. Code. § 8-20-4(3)(k).  The parties agree that a contract exists between GM and Serra, which provides that GM "will have a right of first refusal to purchase the dealership assets or stock and such other rights proposed to be transferred regardless of whether the proposed buyer is qualified to be a dealer."  (Dealer Agreement § 12.3.1.)  It is also undisputed that all conditions outlined in the Dealer Agreement for the exercise of first refusal, as well as each of the four statutory conditions listed above, have thus far been met.

Based on these facts and the plain language of the Franchise Act and the Dealer Agreement, GM clearly has the right to exercise first refusal. Serra argues, however, that such an exercise would violate other provisions in the Franchise Act.  The Court disagrees.

First, Serra contends that GM is prohibited from exercising its right of first refusal because under the Franchise Act, it is an unfair and deceptive trade practice for a manufacturer "[t]o own an interest in a new motor vehicle dealership, to operate or control a dealership, to make direct sales or leases of new motor vehicles to the public in Alabama, or to own, operate, or control a facility for performance of motor vehicle warranty or repair service work," except in certain situations.  Ala. Code § 8-20-4(3)(s). Serra maintains that because GM is exercising its right of first refusal in order to close the Williams Cadillac dealership—and not for one of the statutory exceptions listed in § 8-20-4(3)(s)—such exercise would violate the letter and the purpose of the Franchise Act.

While the Alabama legislature does not define "dealership," it does define a "dealer agreement" or "franchise" as "[t]he written contract between any new motor vehicle manufacturer and any new motor vehicle dealer which purports to fix the legal rights and liabilities of the parties to such agreement or contract, and pursuant to which the dealer purchases and resells the franchise product or leases or rents the dealership premises."  *Id*. § 8-20-3(1).  "There is a generally accepted canon of statutory construction

to the effect that where there is nothing to indicate to the contrary, words in a statute will be given the meaning which is accepted in popular everyday usage." *Republic Steel Corp. v. Horn*, 105 So. 2d 446, 447 (Ala. 1958), *cited in Bean Dredging, L.L.C. v. Ala. Dep't of Revenue*, 855 So. 2d 513, 517 (Ala. 2003). According to Webster's, "dealership" is defined as "an authorized sales agency: the business of a distributor." Webster's Third New International Dictionary of the English Language Unabridged 581 (Merriam Webster, Inc., 1993).

There is no evidence that after exercising its right of first refusal, GM will own or operate a "dealership." GM will purchase the assets of Williams, the Dealer Agreement will terminate, and GM will not engage in the business of selling or leasing new motor vehicles to the public on those premises. Instead, the assets of a business that used to be a dealership will be sold to third parties or reacquired. (Doc. 18 at 24.)

This interpretation is in keeping with Alabama's "fundamental rule of statutory construction." Namely, that a court "ascertain and effectuate the legislative intent as expressed in the statute." *Edwards v. Kia Motors of Am., Inc.*, __ So. 2d __, 2008 WL 2068088, at * 4 (Ala. May 16, 2008) (quoting

*Bright v. Calhoun*, 988 So. 2d 492, 497 (Ala. 2008)).  "In this ascertainment, we must look to the entire Act instead of isolated phrases or clauses."  *Id.* According to the Alabama Supreme Court, "[t]he purpose of the [Franchise] Act is clear.  It is to protect the state's citizens from abuses by motor vehicle manufacturers and dealers, and, to that end, to regulate manufacturers and dealers and the dealings between manufacturers and their dealers."  *Id.* at *3 (quoting *Sutherlin Toyota, Inc. v. Toyota Motor Sales USA, Inc.*, 549 So. 2d 460, 461 (Ala. 1989)).  The Franchise Act "give[s] balance to the inequality of bargaining power between individual dealers and their manufacturers."  *Id.* (quoting *Tittle v. Steel City Oldsmobile GMC Truck, Inc.*, 544 So. 2d 883, 887 (Ala. 1989)).  "The Franchise Act proscribes certain practices, such as persuading dealers to absolve the manufacturer from liability arising from the unfair trade practices enumerated in the Franchise Act."  *Id.*  However, there is no indication that the Alabama legislature intended to prohibit a manufacturer from exercising a negotiated and agreed-upon right of first refusal—when the dealer itself has made the decision to sell its business—so the manufacture can cease distributing its new motor vehicles at that location.

Serra argues that GM's decision to exercise its right of first refusal violates Alabama Code § 8-20-4(2), which proscribes a manufacturer from engaging "in any action with respect to a franchise which is arbitrary, in bad faith or unconscionable and which causes damage to any of the parties." Serra contends that GM's choice to close the Williams dealership, compared with other dealerships nationwide that may be worse performers, is arbitrary and causes harm to both Serra and Alabama consumers.  Serra cites to an Alabama Supreme Court decision defining "arbitrary" action as "one taken without fair, solid, and substantial cause; that is, without cause based upon the law . . . not governed by any fixed rules or standard." (Doc. 18 at 27 (quoting *Lloyd Noland Found., Inc. v. City of Fairfield Healthcare Auth.*, 837 So.2d 253, 269 n.8 (Ala. 2002) (internal quotations omitted).)   Serra also hints that the decision is "more likely in bad faith, given the history of adverse litigation between GM and Serra." (Doc. 18 at 30.)  However, "the remedial purpose of the Franchise Act is to address unfair trade practices *between automobile manufacturers and automobile dealers* in the State of Alabama." *Edwards*, 2008 WL 2068088, at *5 (emphasis added).  Therefore, the Court judges whether an action is arbitrary or in good faith with respect

to the relationship between GM and Williams.

GM and Williams jointly executed a contract that gives GM the unquestioned right to exercise first refusal upon the submission of a proposal for change of ownership.  As outlined above, the right of first refusal is expressly permitted by the Franchise Act, and it is undisputed by the parties that GM, in exercising that right of first refusal, has thus far complied with all conditions set by the Dealer Agreement and the Franchise Act.  Under these facts, GM's action with respect to Williams cannot be "arbitrary" or in "bad faith," as those words are used in § 8-20-4(2).

The Court finds, therefore, that GM's exercise of the right of first refusal in this case is in compliance with the Dealer Agreement and the Franchise Act.

B.     Count II: Structuring Fee.

Pursuant to Section 5.8 of the Asset Purchase Agreement, if Serra closed on the purchase of the Williams Cadillac dealership, Williams would either pay Serra a $200,000 "Structuring Fee" at closing, or deduct the $200,000 from the $600,000 aggregate purchase price.  In the event GM exercised its right of first refusal, Section 5.8 nonetheless requires Williams

to pay Serra the $200,000 Structuring Fee and states that GM is not entitled to any reduction in the purchase price.

GM asks this Court for a declaration that Section 5.8 of the Asset Purchase Agreement is "null and void and of no force" and GM only has to pay Williams a total of $400,000.  (Doc. 17 at 15.)  GM contends that it only has to pay the "net purchase price" or "market-rate price" that Serra would have paid Williams, after deduction of the $200,000 Structuring Fee.  GM argues that Section 5.8 is contrary to the Franchise Act, contrary to public policy, contrary to the Dealer Agreement, and void as a "sham" provision. Defendants Serra and Williams maintain that Section 5.8 is valid and enforceable; Williams is therefore obligated to pay Serra the $200,000 "Structuring Fee"; and GM should pay Williams the purchase price of $600,000.

GM does not cite any applicable case law supporting its contention that Section 5.8 is a "sham" provision or contrary to public policy, nor was the Court able to locate such case law.  GM also fails to establish that Section 5.8 "directly contradicts the plain language" of the Franchise Act. (Doc. 17 at 11.)  GM cites Alabama Code § 8-20-4(3)(k)(3), which states that

the exercise of first refusal must provide "to the dealer the same compensation as, or greater compensation than, the dealer had negotiated to receive from the proposed buyer or transferee."  Yet, GM does not explain how this language prohibits GM paying Williams $600,000 as the purchase price, and Williams then paying Serra the "Structuring Fee" of $200,000.  The language certainly does not preclude GM paying a higher "net" price than Serra for the Williams dealership; the statute states that Williams must receive "the same compensation as, *or greater compensation than*, [Williams] had negotiated to receive from [Serra]."

Finally, GM has not established that the terms of Section 5.8 of the Asset Purchase Agreement are contrary to the prior-executed Dealer Agreement, nor that the Dealer Agreement requires GM to pay Williams only $400,000.   "General contract law requires a court to enforce an unambiguous, lawful contract, as it is written."  *Ex parte Dan Tucker Auto Sales, Inc.*, 718 So. 2d 33, 35 (Ala. 1998) (citing *P & S Bus., Inc. v. S. Cent. Bell Tel. Co.*, 466 So. 2d 928, 931 (Ala. 1985)).  "A court may not make a new contract for the parties or rewrite their contract under the guise of construing it."  *Turner v. West Ridge Apartments, Inc.*, 893 So. 2d 332, 335

(Ala. 2004) (quoting *Dan Tucker Auto Sales*, 718 So. 2d at 35-36).  "[N]or should the court add to the terms of a contract words, terms, or conditions not contained in it."  *Estes v. Monk*, 464 So. 2d 103, 105 (Ala. Civ. App. 1985) (citing *John Hancock Mutual Life Ins. Co. v. Schroder*, 180 So. 327 (1938)).

The Dealer Agreement between GM and Williams provides that in the event GM exercised its right of first refusal and Williams had entered into a "bona fide written buy/sell agreement, the purchase price and other terms of sale will be those set forth in the agreement and any related documents, unless [Williams] and General Motors agree to other terms." The purchase price set forth in the Asset Purchase Agreement is $600,000. There is no provision requiring GM to pay some "net" or "market-rate" reduced purchase price that would have been paid by the proposed buyer, nor is there any language prohibiting a dealer from making an agreement to pay a proposed buyer a fee for the "substantial cost and expense in connection with structuring the transactions contemplated by [the Asset Purchase] Agreement and conducting a due diligence investigation."  (Asset Purchase Agreement § 5.8.)  The terms of sale set forth in the Asset

Purchase Agreement require Williams to make a payment of $200,000 to Serra in the event GM exercises first refusal, and no reduction in purchase price for GM.

While the Structuring Fee may have been crafted, in part, to discourage GM from exercising its contractual right of first refusal, just as Williams is bound by the language of the Dealer Agreement, so too is GM. No party other than GM, given the weight of its bargaining authority as a manufacturer, was in a better position to craft the wording of the Dealer Agreement to preclude payments like the "Structuring Fee" in situations like this one, and ensure that GM paid the lowest price possible. The parties have stipulated that structuring fee or other similar provisions were included in asset purchase agreements approved by GM as early as 1998. (Doc. 15 ¶ 26.) While GM did not exercise its right of first refusal in those instances, and had no reason to challenge those clauses, it should have been aware of those provisions when it executed its Dealer Agreement with Williams in 2005. "Where a contract is unambiguous and plain in expression, we know of no canon of construction that warrants an interpretation the only effect of which is to relieve a party to the contract from consequences deemed by

him hard or unfair." *Dan Tucker Auto Sales*, 718 So. 2d at 37 (quoting *Lilley v. Gonzales*, 417 So. 2d 161, 163 (Ala. 1982)).

However, because Serra will be reimbursed by Williams for at least part of the "substantial cost and expense in connection with structuring the transactions contemplated by [the Asset Purchase] Agreement and conducting a due diligence investigation" through the $200,000 "Structuring Fee," the Court finds that the fee will reduce the amount due Serra under Alabama Code § 8-20-4(3)(k)(4).  This section of the Franchise Act requires a manufacturer to "pay the reasonable expenses, including reasonable attorneys' and accountants' fees that do not exceed the usual, customary, and reasonable fees charged for similar work done for other clients incurred by the proposed buyer or transferee before the manufacturer's or distributor's exercise of its right of first refusal in negotiating and implementing the contract for the sale or transfer."

At the start of this litigation, the Court thought Section 5.8 was a sham provision.  Serra and Williams have convinced this Court, however, that Section 5.8 was negotiated to compensate Serra, in part, "for the vast amount of time its people spend in performing due diligence *and negotiating*

the sweet deal that GM would step into the shoes of."  (Doc. 22 at 9 (emphasis added).)  The Court does not know the total amount Serra claims it is entitled to receive pursuant to Alabama Code § 8-20-4(3)(k)(4). Whatever the sum, GM will be due a credit in the amount of the $200,000 "Structuring Fee."  Therefore, in order to recover under Alabama Code § 8-20-4(3)(k)(4), Serra will have to show that its recoverable expenses under those provisions exceed $200,000.

    C.    Count III: Recoverable Expenses.

    Finally, GM requests a declaration from the Court that it does not have to pay approximately $1.2 million that Serra claims it is owed for incentives offered by the City of Birmingham, which Serra will lose if GM closes with Williams.  GM argues that such claims are not reimbursable under Alabama Code § 8-20-4(3)(k)(4), and the Court agrees.  Serra concedes, however, that it does not seek to recover the approximately $1.2 million under § 8-20-4(3)(k)(4).  Instead, Serra contends it is reserving the right to ask for that amount as damages for claims that currently are not before the Court. (Doc. 22 at 14.)

    Therefore, the Court finds that the approximately $1.2 million in

alleged lost incentives from the City of Birmingham are not recoverable expenses under Alabama Code § 8-20-4(3)(k)(4).  Whether all or a portion of that amount is recoverable as damages for future legal claims is, of course, not a decision the Court makes at this time.

IV.   Conclusion.

Judgment will be entered as set forth above. A separate order will follow.

Done this <u>17th</u> day of <u>April 2009</u>.

_____

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
**153671**